Good morning. May it please the court. This is an important case of first impression. It allows this court the opportunity to clarify and offer judicial guidance on how to apply the duties test for the administrative exemption under the Illinois minimum wage law. The importance of this case is underscored by the Attorney General's amicus brief, which addresses one of the issues presented on review, application of the long duties test for the administrative exemption set forth in the former federal regulations, which Illinois adopted effective April 2, 2004, the date on which the most recent amendment to the Illinois minimum wage law became law. The trial court erred in failing to apply that test in this case. At the outset, there are certain policy considerations that are critical to the court's analysis here. First and foremost, it's the general rule in Illinois that Illinois workers must be paid overtime for hours worked in excess of 40 in the work week. And while this may seem very basic at first blush, it's important because it is the general rule, and so exceptions to that rule, like the administrative exemption, must be narrowly construed. All state and the trial court construed the exemption much too broadly here. Also, the fact that the exemption is an exception to the overtime rule means that the employer must prove each element of the exemption clearly and unmistakably, or the exemption fails. And again, that's something that all state failed to do in this case. Can I ask a question? Yes. Thank you. Why, and I believe it's June of 05, no, January of 05, did all state decide, if you know, why did they just out of nowhere decide, I think what we're going to do is start paying these people overtime, the adjusters? Well, if you look at the memorandum that indicates why all state did just that, that's contained in our appendix, I think it suggests very clearly that all state decided that based on the law at the time, they were at risk if they continued to have auto damage adjusters be classified as exempt. Just wanted to make sure. Go ahead. That's our view, anyway. And second, in terms of the policy considerations, I think it's important here that the Illinois minimum wage law is a remedial statute. And it's clear in the preamble to that law and in the 2004 amendments to that law that the legislature clearly has afforded the broadest protections possible to Illinois workers. And in the 2004 amendment, the Illinois legislature expressly rejected the current federal regulations on the duties test for the administrative exemption. And that's an important fact for several reasons, not the least of which is that the new regulations, that is the current 2004 regulations that the Illinois legislature rejected, materially affect the outcome in this case. Well, here, let's get a little more basic. We're dealing with a statute here that has to be enforced if it's unambiguous, regardless of what you say, public policy may or may not be as the legislature says. So let's talk about the statute. Okay. Any employee employed by a bona fide administrative capacity is defined and covered by the Fair Labor Standards Act 38 and the rules adopted under the Act as both exist on March the 30th, 2003. So tell me on March the 30th, 2003, who was exempt, exempted from the receipt of overtime? Well, What employees? How much did they have to make? They had to make, depending on whether the long, at that point, there was a long test and a short test. Under the long test, they had to make $155 a week at a minimum and up to $250 a week. And under the short test, if they made $250 a week or more, they were subject to the short test. Okay. Okay. The Illinois legislature in 2004 said we'll adopt the new salary threshold for the 2004 regulations, which is $455 a week, but we won't adopt the new duties test. We're the 2003 regulations with respect to the duties test. And if we look at what the 2004 regulations did, they essentially adopted the short test. No question. They eliminated the long test. So the Illinois legislature in decoupling and the Illinois Department of Labor in interpreting have applied the long test here. Wait a minute. Where did they get the right to do that? It's pretty clear, but compensated at the amount of salary, that's a but, it's not a conjunctive, it's a disjunctive, compensated at the amount of salary specified, 29 CFR 541-6001, as proposed in the Federal Register on March 30th, 2003, which I take it was $455 a week. Is that correct? Right. Okay. So we've got any employee employed by a bona fide administrative agency covered by the Federal Standards Act and the rules adopted under the Act as both existed on March 30th, 2003. So that would be any employee that earned between, my math is correct, $8,060 a year to $13,000 a year, and any employee that earns more than $13,000 a year, and the only difference between the two is one you use the long form and the other one you use the short form for determination, but compensated at amount of salary specified as proposed in Federal Register March 31st, but compensated in excess of $455 a week. Now, were all of these adjusters compensated in excess of $455 a week? Yes. And so, what's wrong with what the trial judge did? I believe, Your Honor, that the trial judge should have given deference, number one, to the long test in and after April 2nd, 2004, because the Illinois Department of Labor was charged with administration and enforcement of the Act, and I think based on, for reasons articulated in the amicus brief, which I really don't want to get into in great detail here, that long test should be adhered to here. But even before we get to that question, there's a problem with how the trial court applied the short test before April 2nd, 2004. Well, before April 2nd, 2004, is there really any question here? I mean, what's the problem? It's against the manifest weight? No. There are areas of law replete with what the trial court did, and let me outline some of them to you. First of all, under the 2003 regulations that govern in this case, the threshold issue in any duties analysis is identifying an employee's primary duties. And the 2003 regulations that apply in this case had a percentage of time test that was the benchmark. The trial court did none of that. And that's a serious problem, because that's the threshold question. By the trial court not considering and identifying what the primary duties are, the whole duties analysis was tainted. Secondly, the trial court's analysis was flawed from the start, because the trial court misframed the issue for trial, if you will. It framed the issue as, do the assigned duties of auto and casualty adjusters in Illinois under the policies, procedures, and guidelines applicable to the class as a whole fall within the administrative exemption? This reasoning is flawed for several reasons. First of all, again, the governing regulations in the case say the threshold inquiry is actual primary duties, not the assigned duties, which is precisely what the court focused on. Assigned duties triggers another problem, and that is that the regulation said that job titles and job descriptions are not what's controlling. That's precisely what the court did. It deferred to, if you will, all states' definition of what the adjusters did rather than what the adjusters actually did on a day-to-day basis. What was their actual primary duty? Well, I think in our brief we've outlined, there are differences depending on what adjuster group we're talking about. The closest thing the court came to identifying a primary duty, and it didn't go far enough, was in talking about auto damage adjusters, the court said 85 to 90 percent of their time is spent on inspecting vehicles and writing damage estimates. Now, what I'm saying, it doesn't go far enough, it doesn't break down the differences between those two duties. But what that says, Your Honor, in terms of Is it relevant? Pardon me? Is it relevant, the difference between those two duties? Well, it may be, depending on whether those duties are considered to be exempt or not. In our case, I submit to the court that those two duties are non-exempt duties. If you look at the former regulations, 29 CFR section 207C, I believe, it talks about inspection as being a non-exempt duty. In the case law interpreting that, that provision consistently is held, that inspection duties are non-exempt duties. So, if we take that, just that finding Excuse me, just for one second, maybe I'm missing something, or maybe I'm just slow. I'm looking at this guy, he's an adjuster. You know what his job is, as far as I'm concerned? Adjusting. Adjusting cases. You want this much, we're going to pay you this much, blah, blah, blah. Isn't that what he does? No, Your Honor, because that begs the question. It doesn't deal with the primary duty analysis. The analysis under the regulations that's required is that the inquiry be very fact-intensive. If we look at What does he do? I'm trying to be as fact-intensive as I can. It seems to me that's what they do. If we talk about auto damage adjusters, they inspect vehicles and they write estimates using the PENPRO program. Okay? That's primarily what they do. And their expertise. Well, no. No, Your Honor. That's their position. But according to the regulations, and if we look at those regulations in particular that govern on the discretion and independent judgment prong, the regulations distinguish duties that are skill-based or knowledge-based from duties that are based on discretion and independent judgment. And all state consistently required and graded its adjusters and the adjuster supervisors on how closely they conformed to what was required in their prescribed duties, prescribed standards. And to the extent there was some leeway there, the regulations say that leeway isn't enough to take it out of the skill set. And if you look at the language of the regulations, it says that an employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or categories, is not exercising discretion and independent judgment within the meaning of the exemption. And this is the important part. This is true even if there is some leeway in reaching a conclusion as when an acceptable standard includes a range or tolerance above or below a specific standard. What do you contend is the standard review on this issue? The standard review depends on whether you're looking at the fact-finding, which is clear error, or if you're looking at the law, how the court construed the exemption, it's subject to de novo review. And the case on point, Your Honor, is... It occurs to me that the judge receives facts and makes a determination as to whether the employee's primary duties are administrative in nature. Administrative in nature is a conclusion. It's not a fact. It's not a palpable fact. Now, whether we like it or not, the Supreme Court has adopted this mixed question of law and fact standard, which would mean that this would have to be palpably erroneous, our conclusion that these employees, by virtue of the fact that their job duties and responsibilities satisfy the administrative exemption, meaning that their duties are administrative in nature. This isn't a de novo review. No, Your Honor. It's more difficult than manifest waiting. Your Honor, with respect to the issue of whether employees are exempt under the administrative exemption, that ultimate conclusion on the part of the trial court is subject to de novo review. It is not. It was certainly before City of Belvedere, but it isn't any longer. Well, the... Not according to our Supreme Court. Your Honor, if I may, there's a case right on point, a U.S. Supreme Court case that talks about how... Wait a minute. This is not the federal court. This is the state court. We have to make a determination based upon our law as to our standard of review. Now, if this isn't a question of law, which it isn't, it is a conclusion drawn from facts, then one has to make a determination as to whether the facts have been properly interpreted, almost on a manifest wait basis, if we go the old way, and then make a determination once we conclude that it is... If we conclude it is not against the manifest weight of the evidence, accepting it as true, do we find that the conclusion is erroneous, is a matter of law, or we can accept the Supreme Court's test in City of Belvedere and say it's a mixed question of law and fact. Nothing to do with what the U.S. Supreme Court wants to apply in a federal court. Well, a couple of points, Your Honor, that I think are relevant here, with all due respect. Okay? One is that I think that the trial court clearly relied heavily on cases that it shouldn't have relied on, that construed the 2004 regulations that were clearly rejected by the Illinois legislature in 2004. It relied on cases that rely on those 2004... What did the Illinois legislature reject? You keep saying they rejected. Where did they reject something? They rejected the new federal regulations were promulgated in effect of August 2004. In April 2004, the Illinois legislature looked at the regulations that were coming out and said, we're going to decouple, using the words of the Attorney General, Illinois from federal wage hour law when it comes to the duties test for exemptions. Where does it say that? It says that in 1054A of 820 Illinois. It says that any employee employed in a bona fide executive, administrative, or professional capacity... as both existed on March the 30th, 2003. Am I doing those cases so far? But compensated a rate of salary specified in 29 CFR 541-6001 as proposed in the federal register on March the 31st, 2003, or at a greater amount of salary as may be adopted by the United States Department of Labor.  The word decoupled isn't there, but what the legislature didn't say, Your Honor, was we're not adopting the duties test in those regulations. We're only adopting the salary test. That's right. Okay? And that omission I submit to you is clear that they were changing or rejecting... One can take the position that there's absolutely nothing, nothing ambiguous about this. But the only thing that the legislature did was change the salary base. And by changing the salary base, they eliminated the application of the long-form test. All right. It left you only with the short-form test for people making $455 per week or more. And obviously you have to satisfy both prongs of the short-form test. So if that's the case, then I suppose you've got to tell us where the application of the short-form test was erroneous. Well, I do believe that the application of the short-form test is erroneous for the reasons that we've articulated and that are also contained in the Attorney General's amicus brief. I do think that, you know, the legislature didn't say we're adopting the new tests. And so I agree that you can read the statute the way that Your Honor has suggested, but I also think you can read it the way we suggested, which then says there's an ambiguity in the statute. And if there's an ambiguity in the statute, then we can look to the Illinois Department of Labor's construction. And I think that's precisely what the Court should have done and didn't do in this case. And the question of whether there is or is not an ambiguity in the statute is one of law, right? Pardon me? Is one of law. So that is a de novo test on the question of ambiguity. Correct. I agree. There were also some mistakes made with respect to the first prong of the test and the Court's application that we've outlined significantly in our briefs. I don't know how much more time I have here, Your Honor. Take a couple of minutes. Okay. Thank you. I think it's important to note in terms of the short test, in terms of the administrative exemption first prong, that what the Court did, aside from not defining the threshold question of what is a primary duty, I think the Court erred in not understanding, if you will, the requirement that the 2000 regs state that if an employee meets this test, if the employee engages in running the business itself or determining its overall course or policies, but not if the employee is just involved in the day-to-day operations or carrying out of the business affairs. And that's precisely what adjusters do. The 2003 regulations also distinguish administrative duties from production or in a retail service establishment context, sales work. And what's important here is that all state treated its employees, its adjusters, as production workers. They sold class members' services to the general public in terms of the Good Hands Pledge and their marketing materials, and they treated its adjusters as production workers in terms of giving them production goals and reports and metrics against which to measure their success through the process mastery department. Indeed, it's precisely this type of evidence on which the Davis v. P. Morgan Court relied on, and the Second Circuit relied on, to find that lone underwriters failed to qualify for the administrative exemption. Underwriters were also found to engage in production rather than administrative work because the work they performed was primarily functional as opposed to administrative in nature. And also with respect to the first prong, there is a requirement of substantial importance. The regulations require that the administrative work performed by exempt employees be of substantial importance to the management or the operation of the business of the employer or the employer's customers. Both the cases and the regs clarify that substantial importance. That test is not met merely because there's a financial consequence to what the adjusters do or don't do. And that's precisely what the trial court held and all state argued. More specifically, under the regulations, the substantial importance test is meant to include, and I quote, persons who either carry out major assignments in conducting the operations of the business or whose work affects business operations to a substantial degree. And that substantial degree cannot just be financial. Our class members did neither. And so on that basis, too, I think that all state failed in its burden and the trial court erred. And because of that, because if either prong fails, the exemption fails. And I think based on the primary duty issue, the court's failure to deal with the threshold question, based on the first prong errors and the second prong errors of law committed by the court, as well as the failure to look to the long test in light of the statute, I think it's important here that this court reverse on liability. I think clearly the case has to be remanded with respect to damages. Thank you. Thank you. May it please the court, my name is Rick Godfrey. I represent Allstate. The court had a five-week bench trial, 22 witnesses, 215 exhibits. Every party was given every opportunity to take as much time as they wanted to present the case. Post-trial, the parties at the court's request submitted proposed findings of fact. There was a motion preference. The court then took months, issued a 66-page meticulous, detailed opinion, adding credibility findings into the opinion on various key points, particularly the credibility of witnesses who were paid $70,000 a year to testify that they had never made a decision once in their entire time at the job, which the court found incredulous in light of their testimony. The question before this court is twofold. One, were the trial court's findings against the manifest weight of the evidence? Very simple question with respect to the administrative duty exemption. And two, did the 2004 Illinois Amendment fundamentally change and rewrite the statute to eliminate the short-duty test and impose the long-duty test? Let's start with the first issue, because the short answer to each question is that the court held with ample support in the record and the law, property law. With respect to the administrative exemption test, it's well-supported in the record for four reasons, four simple reasons. One, the facts demonstrate that the work of auto adjusters and casualty adjusters, the primary duty, which is claims handling and adjusting, it's very simple. That's the primary duty the court found was of substantial importance to the ongoing business. Legal obligations and legal risks were created by adjusters. They spent, cumulatively, $5.5 billion of all states' money per year. Reputation in the marketplace, financial condition, they negotiated with people. Those are the findings of the court. So what did adjusters do specifically? Those decisions were driven a lot by computer programs, if you will, or frameworks that the adjusters had to follow. Actually, that's the argument, but the reality as testified to by the witnesses was quite different. Those were guides. And remember, all states subject to bad faith insurance litigation, so one would hope that it provides some guides to people to pay attention so that it complies with the law and their obligations. But take Colossus, for example, which is one of these systems. 50 to 60% of the time, the adjuster's determination was outside the Colossus evaluation guidelines. They were exercising their independent judgment and discretion. These were tools, and the court made findings of that, that they were tools to assist and enhance their exercise of independent judgment and discretion, not to dictate it. They negotiated with insurers. They negotiated with attorneys. They negotiated with body shops. They made evaluations. They conducted investigations. They did comparative fault analyses. These are all facts of record. And in the end of the day, they had their own personal authority, which needed no review. They could cut a check for up to a million, you know, they had a million dollars in authority total. And the data is re-found by the trial court. It's all there on the record. These 66 pages are as detailed fact findings as you can find, and it is the manifest weight of the evidence. Second, what independent judgment did they exercise? Let's just take two examples. We'll take the example of a casualty adjuster. They have to set a reserve. Now, why does that matter? Because Allstate is a public company. Those reserves are cumulatively added and have to be disclosed to the SEC. They have to adjust reserves. They have to negotiate with insurers. They have to negotiate with non-insurers with the suggestion that they're production workers, that these are widget makers. They don't pay widget makers $70,000 a year to exercise judgment like Mr. Czarnecki was paid. He was paid $70,000 plus a year. He was exercising independent judgment and discretion in making these decisions, and that's what the trial court found. They negotiate with body shops. They negotiate with attorneys. These are not production workers, which is a discussion that California courts have recently parted from, and I'll comment on that in a second. Well, going back to Your Honor's question, the tools were there to enhance and improve, if you will, the exercise of independent judgment and discretion, not to dictate a result. That's what the court found. How important was it? How substantial? An average casualty adjuster personally binds Allstate to payments of $1 million or more a year. The average auto physical damage, $2 to $3 million a year. The average total loss representative, $4 to $5 million a year. That's real money. They are the ones who make the decision on how to spend that money, whether to spend that money, on whom to spend that money. They negotiate with both insureds and non-insureds. I suspect that all of us have had discussions at one point or another with adjusters. Various companies differ. Allstate calls itself a good hands company. There's a reason for that. It wants the adjuster to exercise independent judgment and discretion to deal with the person in the marketplace, not just the current customer, but those who are not customers. That's what the court found. Three, one expert testified. There were other experts. The plaintiffs had an expert. One expert testified. The judge said the expert was not the basis for her decision, but confirmed her decision. That was Dr. David Lewin. We were fortunate to have Dr. Lewin. Dr. Lewin is the plaintiff's overtime leading expert. He's testified predominantly for the plaintiffs in overtime cases on the administrative exemption. Here he looked at Allstate, looked at the facts, conducted interviews, looked at the span of control, which is a standard management metric, and said this is all the indicia of independence and autonomy. The normal span of control is 6 to 1. Allstate was 8 to 15 to 1, suggesting strongly to Dr. Lewin, which was his conclusion, in addition to other points, the exercise of independent judgment and discretion. It's unrebutted testimony. It confirms. Finally, the law. This is not a question of first impression. Illinois carries off of, incorporates, and Your Honor was spot on in terms of your questions about the statute, the federal regulations as of a certain date. Every federal court that has considered this question, including one of the principal cases upon which the plaintiffs relied called Robinson-Smith, has rejected their claims, including two federal courts involving Allstate. The Cheatham case in the Fifth Circuit and Gaglione in the District of Arizona. Now why did I mention Robinson-Smith? Robinson-Smith came out against the position we argued for at the district court level. And in the court below, plaintiffs said, hey, Robinson-Smith is our case. Robinson-Smith, the District of Columbia, that's our case. We're just like Robinson-Smith. And it went to the D.C. Court of Appeals, and the D.C. Court of Appeals said, District Court, you're wrong. You got it wrong. And it reversed. So the principal case they relied upon, one of the few federal cases they could cite to, came out the other way eventually in the Court of Appeals. So you have Cheatham, Gaglione, Robinson-Smith, McAllister, Enry Farmers in the Ninth Circuit, Roe Midgett in the Seventh Circuit, and Martin v. Crawford in the Northern District of Illinois, all interpreting the federal regulations which are incorporated, those 2003 regulations, the same way. And then, of course, we have one other factor. In 2002, on November the 19th, and it's in the record, the Department of Labor, the U.S. Department of Labor, issued an opinion analyzing insurance adjusters, analyzing the facts somewhere here and saying these are administratively exempt people. That's the law. So in short, the facts we believe are clear. The court found the facts. They fit within the cases. This is not a question of first impression. And there's no manifest error that was shown. Your Honor asked one question about why did all state change back in 2005. Two points. First, the court below ruled that was inadmissible in a pretrial one because she said it was akin to remedial measures. But I'll answer the question anyway. As of 2005, they'd had the California decision in Bednar that had come down in Bell. And then you had a, I think Robinson Smith had come down by 2005. So it was not as clear to all state with respect to auto adjusters, unlike casualty adjusters. And so they're a conservative company. They didn't like it, but they made a decision that said, look, not clear where the law is going to go here. We think we're right. We're going to fight this. But let's not compound bad errors. They made a decision. That's not of the record, but I think Your Honor is entitled to an honest answer. Just stands to auto damage. It just is auto, yes. All state thought that the courts were wrong before. Subsequently, I think the authorities have proven all state to be correct. But I just represent large corporations, and large corporations tend to be conservative when the law starts going against them. Sometimes they make decisions that say, let's cap our risk. And that's what they did at that time. Now, I should mention one thing. And we became aware of it in preparing for the oral argument. We'll submit a supplemental authority. But for the Bednar-Bell decision, which are based upon the unique California statute, this production dichotomy, the California Supreme Court, in a case called Harris v. Superior Court on December 29th, can't do that? File a motion to cite additional authority. But no argument in the motion. Fair enough. The additional authority. Fair enough, and I'll do that. I didn't want to surprise the court. No, I just didn't want you to surprise your opponent. I'm worried about her. I was equally surprised when I read it a couple days ago. That's the first issue. The second issue is the short test issue. And I think that's what counsel might want to say, a case of first impression. Well, it's not a case of first impression. I would say it's an argument of first impression from my standpoint, but not a case of first impression. And I'll tell you why. Let's start with the waiver. For nine years, or eight years, the case was tried with both parties saying the short test applied. They both read the statute the same way. Ms. Leder is a professor. She literally wrote the book, and we cite her book. Is there anything affirmative in the record that says that the plaintiffs made that statement? You don't have anything cited when you say the parties agreed. I believe that the parties – I'm trying to remember whether anyone disputed the short test applying. The case was tried based upon the short test. It was only raised for the first time after the fact. And it was raised after the fact based upon this. Undated, unauthorized, in terms of unauthorized in the sense that no one knows who the author is and no one knows what the authority is, it's from a web page. We don't know when it was put on the web. This is the Illinois Department of Labor's supposed ruling, which doesn't comply with the Administrative Procedure Act. The case was tried on the short test. And, Your Honor, if I find the citations, I will submit a supplemental authority for the citations for that. But it was tried based upon the short test. Why? Because everyone read the statute the same way. Your Honor already parsed the statute this morning. It does not say the long test now supplants the short test. It does not say the short test does not apply. It does not say we're decoupling. What it simply says is we're going to take the federal regulations as of 2003, except that the threshold is raised. That's all that it does. The plain and unambiguous statute does not support the reading of the plaintiffs. But let's assume that we're wrong. Let's assume that the plaintiffs have a point. That they're not seeking to rewrite the statute. That somehow, by silent omission, we now have the long test as the only way to do it. It's irrelevant. Because the court below made findings that satisfy the long test. The facts of record establish that the adjusters customarily and regularly exercise discretion in independent judgment. That's part of the long test. That's findings of Facts 96-1956. The facts of record establish that the adjusters perform only under general supervision, work along specialized or technical lines. Those are facts of record, 85-90 for findings of Fact 93, conclusion of Law 48. The facts of record establish that they spend nearly all of their time. Ms. Leder quoted that, 85 or 90 percent, just for auto adjusters alone. So even if the long test were to apply, the facts of record establish that the long test is satisfying. But it doesn't. They're seeking to rewrite the statute. And as this Court knows, rewriting the statute is something for the legislature. Can I ask you a couple of questions? Certainly, Your Honor. Especially on standards of review. Now, the meaning of the statute. First of all, the question has to be answered as to whether the statute is or is not ambiguous. What's the standard of review in your mind on that question? The question of ambiguity for a statutory interpretation is one of law by this Court. So it's done up. We decide that. Okay. Once we decide whether it is or is not ambiguous, if we make the determination that it is unambiguous, then its meaning is a question of law, which we declare. Now comes the question of whether the statute's been satisfied. Now, we have factual issues. And I take it from your brief, you'll concede, that on the issue of the questions of fact, it's manifest weight. I think that's clear. Okay. That means any relevant information that's in the record that supports it, whether we would have decided it the same way or not. Correct. Plus it has to be arbitrary in some way. Your Honor knows the standard better than I do. Now we go to the question of whether those facts, if true, equal the two elements of the short-form test. Correct. Okay. Question of law or clearly erroneous? The application of law to fact, I think, is a mixed question of law and fact. Okay. So clearly erroneous. I think that's correct. Okay. Go ahead. Go ahead. I'm going to ask you another question before the end. Go ahead. I'm simply going to conclude by saying that the two points. One, with respect to the issue that Ms. Leder raised about skill and expertise, that these are just technical jobs. Well, we would hope that the adjusters have skill and expertise, but that doesn't mean they're technical jobs. They're not just technical inspectors. And the court made findings explaining that the skill and expertise are necessary in order to do the job of exercising independent judgment and discretion, in order to do the job of substantial importance. I asked a number of the plaintiffs under cross-examination about, do they have a problem having skill and expertise in doing their job? They said, no, of course we need it to do our job. It's kind of a circular argument. If skill and expertise disqualifies you from exercising independent judgment and discretion, then I would submit that we wouldn't want adjusters who have no skill and expertise. So that can't be the touchstone. You just can't proclaim them skill and expertise. The question is, how do they use it? What do they, in fact, do? And that's what the court found below. In sum, to reverse, which is what the plaintiff asked, I think the court would have to take four rather unprecedented steps. One, it would have to weigh the evidence and substitute its own judgment for that of the trial court, which I know this court and Supreme Court do not do. Two, the court would have to rewrite the Minimum Wage Act, I think, to delete the short test, to write language into it that says only the long test applies, and to fundamentally change the entire approach, all based upon a one-page web of unknown date, authorship, publication of an interpretation that, as far as I can tell, has not been followed in the State. You can't find a cited case, certainly, that follows this in the State. Well, you know, we mouth the statement that we give deference to the interpretation of statutes by agencies that are charged with the responsibility of enforcing the statute, but generally we only use that when we want to reach a desired result. And in the other cases, we turn around and say the meaning of the statute is a question of law, which we'll decide without input from the agency. So, I mean, you know, it's kind of a, which way do we want to go? Which rule do we mouth? But generally, I think you find that we only give deference to the agency interpretation after it's first found that the statute is ambiguous. Correct. That's correct. There's no ambiguity. We give them no difference at all. And I don't think there's any ambiguity, and we've argued that. But my point is that when I have seen agency interpretation before, and I've been on both sides of it, it's not been a one-page, unauthored, undated chart on the Web. It's gone through the administrative agency process. It's had a rationale. I don't really know what to do with this. So that, you know, deference is one thing, but abrogating the judicial right of review to an agency, some staffer who put something on the Web, for all I know in January of last year after the case was tried, that's something entirely different. That's not deference. That's an abdication of the judicial function, which I know the court does not do. Third, we do have one opinion letter that's relevant from the Department of Labor of the United States. It's not binding on this court, but it interprets the federal regulations, which are relevant here in November of 2002. It analyzes the facts exactly the way the district court judge below analyzed the facts. And then finally, we have now a long line of consistent federal cases that go one way. If all state had known in 2005 what it knows now, it would not have changed. But in 2005, it took a conservative approach in light of the Bednar decision in California. Thank you. Rebuttal, counsel? Thank you. There are several points that need to be addressed based on Mr. First and foremost is the fact that the appellate decisions to which he refers and on which the trial court relied, all are post-2004. And while those, except for the McAllister case, which is clearly distinguishable on its facts, it involved a death and disability adjuster who admittedly in his discretionary independent judgment. All of the other cases are post-2004. And all of the other cases reference a part of the regulations, the new regulations that the Illinois legislature has rejected, and that is that it's 29 U.S.C. section 541.203. And that regulation says that insurance claims adjusters generally meet the duties test. It's a clear, if they meet certain enumerated duties, it's a clear departure from the 2003 regulations, which say that you can't do that. And so the cases on which counsel relies and the trial court relied all calling it instructive. For example, in the Robinson-Smith, the court cites to that regulation and says at the decision it says that the district court found that the GEICO's adjusters, after citing the reference, cannot be automatically classified as exempt employees because they perform only three of the seven duties. And we will take great deference in terms of looking at the new regulations and the Rome Midget court did the same thing, the Seventh Circuit did the same thing, referencing that same provision, as well as all of the other cases, actually, but specifically Rome Midget Farmers and Robinson-Smith, the auto adjuster cases, gave great deference to that provision, which the Illinois legislature rejected. The Illinois legislature said those regulations don't apply. And so the predicate for the trial court's findings, conclusions of law, is flawed, are flawed. The predicates in terms of the cases are based on decisions that adopt the 2004 regulations that the Illinois legislature expressly rejected. And so I think that's an important point to consider in terms of the error of law committed here in Allstate's argument. There are material differences between the 2004 regulations and the 2003 regulations that Allstate glossed over in its brief, and those differences deal with the interpretive regulations, how a primary duty is defined, how directly related is defined, whether the dichotomy applies in a particular case. Those regulations, those aspects of the regulations, are materially different between 2003 and 2004, and this particular provision about insurance adjusters and certain classes of employees who will be deemed to be exempt under the duties test if they have certain job duties, there is nothing in the form of regulations that's comparable. And again, that's what the courts relied on, including the trial court. I think it's also important to note that the way the trial court approached this case and the way Allstate approached its burden in this case was to rely on the buzzwords of exemption, if you will. Things like from the 2002 opinion letter, which were focused on words like negotiating without defining what that means, which focus on things like interviewing. Here Allstate employees interviewed according to scripts. Everything was prescribed. That's what skill-based decision-making is about. That's the kind of decision-making that the regulations say is not exempt work. And so I think that the trial court clearly conflated, if you will, skill-based decision-making and knowledge-based decision-making, which is not exempt under the 2003 regulations, with decision-making based on discretion and independent judgment, which is exempt work. And I think that that is part of the problem with the trial court's findings and conclusions. Is that their mistake on the trial court's part? I think that a couple of other points that need to be addressed that counsel raised. I think that the fact that the trial court and Allstate argues that the 2003 regulations require that job duties and job descriptions are not what's determinative here, because that's essentially begging the primary duty question. It's saying that the title is what controls. It's antithetical to the 2003 regulations and the case law arising under it. You might be right. Regulation provides it doesn't control, but it's not irrelevant. I mean, it's evidence. I mean, it's not outcome determinative, but it certainly is relevant to what they do. It's relevant, but not only is it not controlling, it doesn't engage in the kind of primary duty analysis that the regulation requires in terms of the ordinary rule of thumb saying that you have to look at whether 50% or more of the adjuster's duties are performed doing non-exempt work or exempt work. And that's what the trial court didn't do. That's an error. That's a clear error. And Allstate didn't introduce that evidence. So for counsel to say in his argument that Allstate introduced evidence about percentage of time, they did none of that. And that makes them fail in their burden under both the long test and the short test, because there are additional percentage of time requirements under the long test which are articulated in our brief. Okay. Thank you. Counsel, thank you. That will be taken under advisement. Court stands adjourned.